## AFFIDAVIT OF SPECIAL AGENT MICHAEL L. RYAN
## IN SUPPORT OF CRIMINAL COMPLAINT

I, Special Agent Michael L. Ryan, being duly sworn, depose and state as follows:

### Introduction

1. I am a Special Agent for the Department of Homeland Security ("DHS"), Office of Inspector General ("OIG"), assigned to the Boston Sub-Office. I have been employed in that capacity since April 2009. I am a law enforcement officer of the United States empowered by law to conduct investigations, make arrests, and execute search and seizure warrants as enumerated in 18 U.S.C. §§ 3105 and 3106.

2. My primary duties consist of conducting criminal investigations into alleged wrongdoing by DHS employees and contractors, and/or involving DHS programs, as directed by the Office of Inspector General. These investigations include corruption, bribery, embezzlement, impersonation, and other offenses that affect DHS personnel and programs. Before my present position, I was the Assistant Federal Security Director for Law Enforcement for the Transportation Security Administration ("TSA") in Massachusetts. While employed with TSA, I participated in numerous criminal investigations, including service as a Task Force Agent with the Federal Bureau of Investigation's Joint Terrorism Task Force in Boston, Massachusetts.

3. I received my initial training in complex criminal investigations at the Federal Law Enforcement Training Center, and have had additional training in investigative techniques, interviewing, and firearms, among other things. Before my employment in federal law enforcement, I attended the U.S. Coast Guard Academy and served as a commissioned officer with the U.S. Coast Guard for over six years.

4. I submit this affidavit in support of a criminal complaint charging JAMIE L. MELO ("MELO") with, on or about November 10, 2015, in the District of Massachusetts:

    a. With the intent to evade a currency reporting requirement under 31 U.S.C. § 5316, knowingly concealing more than $10,000 in currency on his person or in a conveyance, article of luggage, merchandise, or other container, and transporting such currency from a place in the United States to a place outside the United States, specifically Portugal, in violation of 31 U.S.C. § 5332 (commonly called "bulk cash smuggling"); and

    b. Knowingly structuring and assisting structuring the export of monetary instruments, specifically U.S. currency, from the United States to Portugal, while aware of, and for the purpose of evading, a currency reporting requirement under 31 U.S.C. § 5316, all in violation of 31 U.S.C. § 5324(c)(3); and

    c. Conspiring to commit the above offenses, in violation of 18 U.S.C. § 371.

5. I have personally participated in the investigation underlying this application for a criminal complaint. I am familiar with the facts and circumstances of this investigation from my own participation and from oral and written reports by other law enforcement officers. Because this affidavit is submitted for the limited purpose of supporting an application for a complaint, I have not included every detail of the investigation.

6. MELO, a U.S. citizen born in Portugal, is currently employed as a captain with the Bristol County Sheriff's Office ("BCSO"), headquartered in North Dartmouth, Massachusetts. MELO's duties appear to include coordinating with members of the Azorean government in Portugal. These duties have involved coordinating BCSO participation in a Thanksgiving meal in the Azores, Portugal, for people previously detained at BCSO and deported back to the Azores for immigration violations.

7. Carlos Rafael, also a U.S. citizen born in Portugal, resides in North Dartmouth, Massachusetts. He owns approximately 40 fishing vessels, most of which are based in New Bedford, Massachusetts. Rafael also owns Carlos Seafood, Inc., a commercial fishing business based in New Bedford.

**Certain Facts Supporting Probable Cause**

**I.   Undercover Agents Meet with Carlos Rafael on October 14, 2015**

8. In May 2015, agents of the Internal Revenue Service – Criminal Investigations Division ("IRS-CI") began an undercover operation targeting Carlos Rafael. IRS-CI suspected that Rafael was not declaring significant portions of the revenue from his commercial fishing business. After an initial telephone call, two undercover agents ("UCs") began a series of meetings with Rafael, posing as potential buyers for Rafael's business. The UCs made clear to Rafael that they were interested in taking over both the legal and illegal aspects of Rafael's business.

9. On October 14, 2015, the UCs met with Rafael at a restaurant in southeastern Massachusetts. The meeting was recorded. During the meeting, Rafael told the UCs that he hid the cash proceeds of illegal fish sales in part by smuggling the money overseas to Portugal. Rafael said he sometimes took the money himself, but also used the services of a local sheriff's deputy named "Freitas."[1] Rafael also described his relationship with "the captain at the prison and the Sheriff." Later in the conversation he referred to the "captain" as "Jimmy Melo." Rafael also

---

[1] Further investigation revealed that Freitas was Antonio Freitas, a sheriff's deputy at BCSO and a Task Force Officer at U.S. Immigration and Customs Enforcement. Based on a separate incident occurring on February 5, 2016, during which Freitas smuggled $17,500 in cash to Portugal for Rafael, both men were charged with bulk cash smuggling and Freitas with structuring; on March 30, 2017, Rafael pleaded guilty to bulk cash smuggling, among other charges, and on July 19, 2017, Fretias was convicted on both charges after a jury trial.

talked about supporting a Thanksgiving dinner in the Azores by providing turkeys: "I'm going to go buy like 80 turkeys, I've got to fly 80 turkeys over there." He added that he planned to put the turkeys in styrofoam boxes and transport them via "SATA," which is a Portuguese airline.

10. In telephone conversations with a UC later in October 2015, Rafael said he would be traveling to Portugal in November 2015. Initially he agreed to have the UCs travel with him, but later told the UCs that he had changed his mind because he would be traveling with law enforcement officers.

II. **MELO Coordinates Smuggling About $50,000 to the Azores on Behalf of Rafael**

11. In early November 2015, a review of flight records showed that MELO and Rafael were scheduled to depart Logan International Airport on November 10, 2015, for João Paulo II Airport, Ponta Delgada, São Miguel, Azores, Portugal, on a SATA flight.

12. On the evening of November 10, 2015, agents conducting surveillance at the airport saw MELO and Rafael arrive at Terminal E in a white van and a white box truck, both marked as vehicles belonging to the BCSO. Agents saw MELO, Rafael and others unload several items from the vehicles, including baggage, wheelchairs, and boxes, which were then processed by SATA.

13. Per my review of SATA business records for the flight, MELO travelled with approximately 136 pieces of checked baggage. An email address beginning with "JMELO" and phone number XXX-XXX-5252 (which is assigned to MELO) were listed as the contact information for the travel reservation for Rafael's travel on November 10, 2015. MELO's travel reservation was paid for by the Azorean Government. MELO and Rafael sat next to each other on the flight, in first class seats 1A and 1B, respectively.

14. MELO completed TSA passenger screening without incident. During TSA screening, however, Rafael was found to be in possession of a large amount of U.S. currency. A search of

4

his carry-on baggage revealed about $26,403, after which Rafael was required to fill out FINCEN Form 105. Following the inspection, Rafael was allowed to board the plane with the money. (Later, on or about November 30, 2015, Rafael told one of the UCs during a consensually recorded call that they were lucky they did not accompany Rafael, because he himself was caught trying to smuggle money through security.)

15. Based on my investigation, several acquaintances of MELO and Rafael were also on the SATA flight to Portugal on November 10, 2015. Several of these people, coordinated by MELO, helped Rafael smuggle additional cash to Portugal beyond the approximately $27,000 Rafael himself was caught with on that date. The other travelers of note were:

    a. Person A, a male residing in in Fall River, Massachusetts. He is a U.S. citizen of Portuguese decent.

    b. Person B, the spouse of Person A. She is a U.S. citizen of Portuguese decent.

    c. Person C, a male residing in North Dartmouth, Massachusetts. He is a U.S. citizen of Portuguese descent..

    d. Person D, a male residing in New Bedford, Massachusetts. He is a U.S. citizen of Portuguese decent.

16. Person A travelled his wife – Person B – to Portugal from Boston on the same flight as Rafael and MELO. Earlier in the day on November 10, 2015, Persons A and B arrived at MELO's residence in North Dartmouth, Massachusetts, to help assemble boxes of supplies in preparation for the trip to the Azores. The couple later traveled to the airport in a BCSO van. Also present in the van were MELO, Rafael, Person D, and a BCSO driver.

17. Upon arriving at the airport, near the SATA ticket counter, MELO approached Person A and asked him to carry two envelopes of money on the upcoming flight. Person A agreed, and MELO told him to go to the public bathroom in the terminal, where MELO would give him the envelopes.

18. Person A then went into the mens' bathroom in Terminal E, located on the public side of the security screening checkpoint, and entered a bathroom stall. Shortly thereafter, MELO knocked at the stall door and gave Person A two envelopes. When Person A exited the stall, Melo, Rafael, Person C and Person D were present in the restroom as well.

19. Person A followed MELO out of the restroom. Person A kept one of the envelopes and, before passing through security, gave the other one to Person B to put in her purse, alerting her that the envelope contained money. Persons A and B passed through security without incident.

20. While on the flight, with reference to the envelopes, MELO told Person A not to worry, because everything was under control. Upon arriving in the Azores, Person A gave MELO the envelopes carried by Person A and his wife.

21. On or about April 26, 2016, I participated in an interview of Persons A and B. Persons A and B initially denied carrying money through security for someone else on November 10, 2017, before later making clear that they had done so. Person A said he was a friend of MELO and did not want anything bad to happen to him.

22. Following the interview, Person A went to MELO's residence. MELO asked Person A to take a ride with him. In the car, Person A told MELO about the interview. MELO typed a text message into his cellular telephone that said, "Are you wired?," and showed it to Person A. After Person A assured MELO that he was not wearing a recording device, MELO apologized for getting Person A involved in smuggling the envelopes of money.

23.     Person C also traveled to Portugal on November 10, 2015, on the same flight as MELO, Rafael, and Persons A and B.  Earlier on November 10, 2015, Person C called MELO and made arrangements for him and his wife to get a ride to the airport.  Person C and his wife travelled with a third person to a rest area on Route 24 in Bridgewater, Massachusetts.  From the rest area, Person C and his wife rode in the BCSO van to Logan.

24.     At the airport, before passing through security screening, MELO asked Person C to accompany him to a restroom.  In the restroom, in the presence of Rafael and Person D, MELO handed Person C an envelope containing cash.  MELO told Person C that "Carlos" wanted him to take the envelope.

25.     Person C put the envelope in a briefcase or bag and, with his wife, passed through security without incident.  Upon landing in Portugal, while having coffee with MELO and Rafael, Person C gave the envelope to Rafael.

26.     On or about May 16, 2016, I participated in an interview of Person C.  In this and a later interview, he initially denied carrying cash through security for another person.  He later acknowledged lying to the agents, saying that he did so because he did not want to make his "good friend" (MELO) "look bad."  Person C noted that, when he told MELO he had been interviewed by federal agents, MELO told him to tell them the truth and, if need be, MELO would lose his job.

27.     Person D also traveled to Portugal on November 10, 2015, on the same flight as MELO, Rafael, and Persons A, B and C.  Earlier on November 10, 2015, Person D first traveled to MELO's residence before traveling to the airport in a BCSO truck.

28.     Once at the airport, either inside or just outside the mens bathroom on the public side of airport security, MELO gave Person D an envelope containing cash.  Rafael and Persons A and C were also present.  In response to being given the envelope, Person D asked MELO to wait and

said that he was already carrying $2,700 (that is, that Person D did not want to take additional money that would put Person D over the $10,000 cash threshold). Person D also told MELO that if the envelope contained over $10,000, then Person D was the one who would get caught, not MELO. MELO replied that Person D should not worry about it. Person D saw MELO give envelopes to Persons A and C as well.

29. Upon landing in Portugal the following day, Person D returned the envelope to MELO.

30. On or about April 26, 2016, I participated in an interview of Person D. In this and later interviews, he denied carrying money through security for another person. At a later date Person D admitted lying to the agents and told them about carrying the envelope of cash through the airport. Person D also said that, at some point after an earlier interview, he had talked to MELO at a Dunkin Donuts in New Bedford or Dartmouth, Massachusetts. MELO told Person D that he had heard that Person D was "going to court" and asked Person D to help him. MELO told Person D that the money in the envelope belonged to Rafael and that MELO was "screwed" and would probably lose his job.

31. As noted above, the SATA flight to Portugal on November 10, 2015, landed on November 11, 2015. It appears that Rafael, Persons A, B, C and D, and potentially MELO, carried cash on the flight, with Rafael declaring cash at security only after $27,000 was found in his carry-on bag.

32. According to business records obtained from Portugal through a treaty request, two days later, on November 13, 2015, $76,000 in cash was deposited into a Banif Bank account (no. XXXXXXXXXX3910) in the name of Rafael ("Carlos Alberto Noia Rafael"). Banif Bank was later absorbed by Santander.

33. The deposit slip was signed by Carlos Rafael; investigating agents recognized the signature from other documents obtained during the investigation. The slip also specifies that the deposit was made in U.S. dollars, not in euros, which are the domestic currency in Portugal.

34. As noted above, while passing through security at Logan Airport on November 10, 2015, TSA personnel discovered that Rafael was traveling with $26,403 in cash. Subtracted from the $76,000 deposit at Banif two days later, the remaining $49,597 was carried by Persons A, B, C, and D and MELO. Divided among those five people, each person would have carried approximately $9,919, an amount just below $10,000 cash.

35. Based on my training and experience and that of other agents assigned to this investigation, structuring often involves the deposit or other transfer of just under $10,000 per transaction (for example, two $9,500 bank deposits instead of one $19,000 deposit). Using amounts just below the $10,000 threshold avoids the relevant federal reporting requirement while using the minimum number of transactions. In this instance, Rafael himself traveled with about $27,000, leaving just under $50,000, which MELO, apparently at Rafael's behest, then divided among five travelers, each carrying just below $10,000 for Rafael.

**Conclusion**

36. Based on the foregoing, I submit that there is probable cause to believe that JAMIE L. MELO has committed bulk cash smuggling, in violation of 31 U.S.C. § 5332; structuring, in violation of 31 U.S.C. § 5324; and conspiracy, in violation of 18 U.S.C. § 371.

I declare that the foregoing is true and correct.

_____
Michael Ryan
Special Agent
U.S. Department of Homeland Security, Office of Inspector General

Subscribed and sworn to before me this ___30th___ day of August, 2017.

_____
HON. M. PAGE KELLEY
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS