## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| v.   ) | Criminal No. 17-cr-10329-DJC |
| ) | |
| **JAMIE L. MELO,**   ) | |
| ) | |
| Defendant   ) | |

## OPPOSITION TO MOTION TO SUPPRESS

The United States respectfully submits that the Court should deny defendant JAMIE L. MELO's ("MELO") motion to suppress (Doc. 35). As the government will demonstrate at an evidentiary hearing on April 27, 2018, while agents did not advise MELO of his *Miranda* warnings, they were not required to do so because MELO was not in custody. As support, the government submits as follows:

### Background

MELO is a Captain with the Bristol County Sheriff's Department ("BCSO"). The indictment charges him with conspiring with others to smuggle U.S. currency through Logan International Airport to Portugal to avoid federal reporting requirements that require international travelers to declare $10,000 or more in currency they have in their possession. On November 10, 2015, MELO's co-conspirator, CARLOS RAFAEL, gave MELO four envelopes of cash to carry on their flight to the Azores to avoid having to report the cash. Before going through security, MELO gave three of the envelopes of cash to three of his friends in an airport bathroom and asked them to carry the envelopes for RAFAEL on the flight to the Azores. On August 30, 2017, MELO made incriminating statements to law enforcement agents that are relevant to the charges in the indictment.

**Factual Summary**

On the morning of August 30, 2017, two law enforcement agents interviewed the defendant at his residence in North Dartmouth, Massachusetts. The two agents who interviewed MELO were FBI Special Agent Alison Pauly and Special Agent Michael Ryan of the Department of Homeland Security, Office of Inspector General. The agents knocked on MELO's door, identified themselves, and asked if they could talk inside. MELO agreed, did not seem surprised, and let the two agents inside. As protocol, upon entering, the agents asked who was in the house and had MELO secure his dog in the garage. Because MELO was an armed law enforcement officer, they agents also secured MELO's service weapon. MELO also informed them that he had a personal firearm locked in a safe.

After securing the dog and weapon, the agents spoke to MELO about their investigation into CARLOS RAFAEL and ANTONIO M. FRIETAS, a follow member of the BCSO, and asked MELO for his cooperation in the investigation. To be clear, the agents were seeing if MELO would admit to committing crimes with FRIETAS and RAFAEL, but wanted to use MELO was a cooperating witness in their investigation. A year-and-a-half earlier, on February 26, 2016, federal agents arrested RAFAEL on a criminal complaint. Thereafter, on May 4, 2016, a grand jury returned a multi-count indictment charging RAFAEL. The indictment also charged FRIETAS, a Sheriff's Deputy also employed at the BCSO with bulk cash smuggling and structuring. RAFAEL pled guilty and a jury convicted FRIETAS at trial.

MELO and the agents sat at his dining room table. MELO offered the agents coffee and water. Before answering questions, MELO told the agents that he wanted to contact his attorney so he could answer their questions with his attorney present. MELO said he wanted to answer their questions and cooperate, but wanted to get his attorney on the phone. Contrary to MELO's

assertions, the agents did not express any reluctance or resistance to MELO's request and minutes later at approximately 8:28 a.m., MELO was the phone with his attorney, John Zajac of Taunton, Massachusetts. Attorney Zajac said that he could not personally be there, but could be on the phone with MELO by around 9:30 a.m. If anything, in speaking to Attorney Zajac, the agents expressed the importance of talking to MELO that day instead of rescheduling their conversation.

The agents asked, and MELO consented to a search of his cellular phone and two computers. MELO signed consent to search forms for all the devices. After agreeing to the search, at approximately 8:35 a.m., two members of the FBI's Computer Analysis Response Team ("CART") entered the residence to search the devices. The CART technicians did not participate in interviewing MELO, but instead were there to copy the data from MELO's cellular phone and two computers. Contrary to MELO's assertions, only two law enforcement agents were present in MELO's residence and, other than an initial protective sweep, there was no search of MELO's residence by multiple agents.[1]

Attorney Zajac called back at approximately 9:36 a.m. Before that, the agents did not seek to question MELO until his attorney could participate over speakerphone.[2] After Attorney Zajac called back, he asked the agents if his client was a target of their investigation. The agents confirmed that he was; a fact that MELO apparently already knew.[3] Over the next several hours, from approximately 9:36 a.m. until approximately 12:30 p.m., the two agents asked MELO about his

---

[1] *See* MELO's Affidavit at ¶ 16: "I remain [sic] seated at my dining room table with two agents while many others agents searched my home." Contrary to his assertions, there were not "many agents" and they did not search his home.
[2] *See* MELO's Affidavit at ¶ 13: "The agents allowed Attorney Zajac to participate by telephone and they did not question me until he could participate in the call."
[3] MELO concedes that he knew he was a target of the investigation. *See* MELO Affidavit at ¶ 21: "My attorney asked the agents if I was a target of their investigation and they replied that I was and, at that point, I knew I was a target of their investigation."

relationship with RAFAEL and FRIETAS, and about the November 10, 2015 flight to the Azores with RAFAEL. During that flight, RAFAEL gave MELO four envelopes filled with cash in an effort to avoid the well-known requirement to report the possession of more than $10,000 in U.S. currency. The agents questioned MELO in an effort to convince him to cooperate with their investigation. All the questioning was done with MELO's attorney participating by phone.

Throughout the interview, the tone of the conversation was cordial, polite and friendly. In addition to the case, MELO opened up about some personal problems including his health and weight. MELO was diabetic, and Agent Ryan offered to get his medication. MELO said he was okay. During the interview, while MELO sat at his dining room table, he got up to get water from the kitchen and to go to the bathroom. Neither agent prevented MELO from getting up, getting water or going to the bathroom. While the agents may have a kept an eye on MELO as he walked to the bathroom, and followed from a distance, they did not go into the bathroom, physically escort him, or restrict his movement. Furthermore, while the agents did not tell MELO he was free to leave, they also never told him that he was not free to leave. The cordial and polite tone of the conversation did not call for any *Miranda* warnings.

The interview was also not a continuous three-hour interview. Several times, Attorney Zajac requested a short break to attend to other matters. At approximately 10:22 a.m., Attorney Zajac requested a short break, he briefly hung up, and the call resumed at approximately 10:31 a.m. About ten minutes later at approximately 10:41 a.m., Attorney Zajac requested another break. Attorney Zajac called back at approximately 11:23 a.m., and the interview resumed. Then for a brief moment between about 11:29 a.m. and 11:33 a.m., Attorney Zajac's phone signal dropped and agents suspended their questions until Attorney Zajac was back on the phone with MELO. After that, the interview continued for another hour, but with Attorney Zajac still on the phone.

During the interview, MELO made several admissions that directly pertain to the charges in the indictment. For example:

- MELO said that he had met RAFAEL through a charity event in the Azores. RAFAEL had asked for MELO's help funding a charity event in Azores. At the time of the flight, MELO considered RAFAEL to be a friend and sat next to RAFAEL in first class.

- As alleged in the indictment, MELO admitted that he had booked both his and three friends (Persons B-E in the indictment) flights to the Azores. MELO said that on November 10, 2015, two other BSCO Sheriff Deputies drove him, RAFAEL, and his friends in a van to Logan International Airport.

- MELO said that RAFAEL asked him if he and his friends could take some envelopes on their flight to the Azores. MELO asked his friends to carry the envelopes. Even though RAFAEL did not tell him what was in the envelope, and he did not look inside, it became clear to MELO that something was wrong when airport security caught RAFAEL with $27,000 in cash. Immediately after the incident, RAFAEL bragged that $27,000 in cash was like "coffee money for me." Later in the interview, MELO specified that he saw security pull RAFAEL aside and admitted that (at that moment) he believed that there might be cash inside the envelopes RAFAEL gave him. While on the plane, MELO said he had a bad feeling about what RAFAEL was doing and thought there was cash in the envelopes. MELO said he became scared on the plane and told one of his friends on the flight to whom he gave one envelope, "This is bad."

- Before going through security, MELO said that RAFAEL gave him the envelopes (four of them). MELO then asked his friends to follow him into the airport bathroom before security. In the bathroom, MELO gave the envelopes to three of his friends, and kept one for himself. Later on in the interview, around 10:30 a.m., MELO stated that he did not remember if RAFAEL had said if there were cash in the envelopes. MELO also said he got the envelopes from RAFAEL in the van on the way either to or at the airport.

As the interview went on, the agents circled back over different topics and challenged MELO's assertions. MELO's answers were, at times, inconsistent. The agents reminded MELO that not telling the truth to federal agents was a crime. For example, the agents asked MELO if he had talked to FREITAS on November 10, 2015, the day of his flight to the Azores with RAFAEL. MELO claimed he had not spoken with FRIETAS that day (even though phone records showed phone calls between the two).

At approximately 12:30 p.m., after it became apparent that despite the agents' efforts, that MELO was unwilling to cooperate, was providing inconsistent answers, and was denying his knowing involvement in bulk cash smuggling, the investigative team made a decision, in coordination with the U.S. Attorney's office, to make a probable cause arrest. At that point, the agents informed his attorney that they were arresting him and the questioning ceased.

## ARGUMENT

A.   **Custodial Interrogation under Miranda**

Miranda applies to "custodial interrogation." *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612 (1966); *Thompson v. Keohane*, 516 U.S. 99, 102 (1995)); *Rhode Island v. Innis,* 446 U.S. 291, 300 (1980). The term "custodial interrogation" means, "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444. Put another way, the question is whether the circumstances of the interrogation amount to a "restraint on freedom of movement of the degree associated with a formal arrest." *United States v. Hughes,* 640 F.3d 428, 435 (1st Cir.2011) (*quoting California v. Beheler,* 463 U.S. 1121, 1125 (1983) (per curiam)). In *Thompson v. Keohane*, the Supreme Court explained the custody determination as follows:

> Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.
>
> *Keohane*, 516 U.S. at 112 (citation and internal quotation marks and alterations omitted).

The inquiry is thus an objective test: "how a reasonable [person] in the suspect's shoes would have understood this situation." *Berkemer v. McCarty*, 468 U.S. 420, 422 (1984); *J.D.B. v. North Carolina*, 564 U.S. 261, 270–71 (2011). Among the factors cases in the First Circuit considers are: (1) whether the suspect was questioned in familiar or at least neutral surroundings; (2) the number of law enforcement officers at the scene; and (3) the degree of physical restraint placed upon the suspect and the duration and character of the interrogation. *United States v. Hinkley*, 803 F.3d 85, 90 (1st Cir. 2015).

"Custody determinations are mixed questions of law and fact that require a court to examine all the circumstances surrounding an interrogation." *United States v. Mittel-Carey*, 456 F. Supp. 2d 296, 305 (D. Mass. 2006), *aff'd*, 493 F.3d 36 (1st Cir. 2007) (*citing United States v. Trueber*, 238 F.3d 79, 93 (1st Cir.2001) and *United States v. Ventura*, 85 F.3d 708, 711 n. 2 (1st Cir.1996)). Furthermore, while "[t]he defendant bears the burden of proving custody by a preponderance of the evidence" *United States v. Peterson*, 506 F. Supp. 2d 21, 23 (D.D.C. 2007), "[t]he government bears the burden of showing that the defendant's in-custody statements were obtained in compliance with the dictates of *Miranda* and were otherwise voluntary." *United States v. Chaidez-Reyes*, 996 F. Supp. 2d 1321, 1345 (N.D. Ga. 2014).

An analysis of these and other factors, and the totality of the circumstances, demonstrates that there was clearly no custodial interrogation. MELO's statements were also knowing and voluntary and should be admissible at trial.

**B.    The Defendant was not in Custody.**

    **1.  The Interview Took Place in a Familiar and Neutral Environment.**

First, the interview took place in a familiar and neutral environment, the defendant's own living room. The agents asked MELO if they could talk inside his house and he agreed. They

spoke seated at his living room table and MELO offered them water and coffee. Several times, MELO got up, got water from his own kitchen, and used the bathroom. Though questioning in a suspect's dwelling may at times comprise a custodial interrogation, *see, e.g., Orozco v. Texas,* 394 U.S. 324, 326 (1969), the cases make clear that a suspect's personal residence generally presents a less intimidating atmosphere than a police station. *See, e.g., United States v. Crooker*, 688 F.3d 1, 11 (1st Cir. 2012) ("[the defendant] was questioned in familiar surroundings where, in general, questioning tends to be significantly less intimidating than questioning in unfamiliar locations"); *United States v. Hughes*, 640 F.3d 428, 435 (1st Cir. 2011) ("And it is important to note that the interview occurred in surroundings familiar to the defendant: his own home"). *United States v. McCarty,* 475 F.3d 39, 42, 46 (1st Cir.2007).

    **2. The Number of Law Enforcement Officers**

Second, contrary to the impression left by his affidavit, MELO's house was not filled with federal agents conducting a search of his home. In fact, there were only two agents - no weapons were ever brandished; no handcuff or restraints were ever used; and the conversation was polite, cordial and friendly. *See United States v. Nishnianidze,* 342 F.3d 6, 13–14 (1st Cir.2003) (finding interrogation non-custodial when questioning conducted by three officers). The other two members of law enforcement were computer technicians, not armed law enforcement agents. They took no part in the interview and conducted the imaging of the cell phone and computers quietly in a separate room.

    **3. The Degree of Physical Restraint and the Duration and Character of the Interrogation**

Third, there was no formal arrest and no significant constraint on MELO's movement and action. MELO's assertion that he did not feel free to leave his living room table is contradicted by the facts. MELO did not remain seated for the duration of the interview. He got up to get

water and go to the bathroom. Under these circumstances – interviewing a trained law enforcement officer suspected of criminal activity with two firearms in his house - the fact that the agents may have kept an eye on him was an appropriate balance between safety and freedom of movement.

In any event, the cases make clear that the court's determination of custody should not involve any consideration of the "actual mindset" of the suspect. *Yarborough v. Alvarado*, 541 U.S. 652, 667 (2004); *see also California v. Beheler,* 463 U.S. 1121, 1125, n. 3 (1983) *(per curiam)*. "The subjective views of the interrogating officers or the person being interviewed have no bearing on [the custody] inquiry." *Locke v. Cattell*, 476 F.3d 46, 52 (1st Cir. 2007); *United States v. Nishnianidze*, 342 F.3d 6, 13 (1st Cir. 2003).

Fourth, while the duration of the interview was more than two hours, under the circumstances of this case, the duration of the interview, by itself, did not convert it into custodial interrogation. The duration of the encounter is "never a singly determinative factor." *United States v. Fernandez-Ventura*, 132 F.3d 844, 848 (1st Cir. 1998) (internal citation omitted).

### 4. The Defendant was not Constrained and Isolated Because his Attorney Participated in the Interview.

Most significantly, MELO had unfettered access to his attorney during the interview. While it was more than two hours long, MELO's attorney participated in the *entire* interview. The attorney had the opportunity (and did) ask questions including whether MELO was a target of the investigation. The questions ceased when the attorney needed to get off the phone and only resumed when he got back on the phone.

The cases that MELO cites are clearly distinguishable on the facts, and none of them involves a situation where a suspect actually had an attorney present during the interrogation. *United States v. Bunnell*, 106 F.Supp.2d 60, 67 (D. Me. 2000) involved not two but six police

officers crowded into a small apartment. While inside the apartment, the police directed the defendant to remain in the kitchen and kept him apart from his roommate. The court found the fact that the police physically separated the defendant from his roommate, "a possible source of moral support," along with other facts, created a coercive environment. *Id.* at 67. In the court's view, even though the custody determination was "an extremely close question," *Id.* at 68, these facts turned the defendant's apartment into a police controlled environment.

The instant case is far different. Instead of six, there were two law enforcement agents. The agents never restricted MELO's freedom of movement, and most significantly, gave him unfettered access to his lawyer. Thus, unlike *Bunnell*, instead of being isolated, the agents permitted MELO to connect and consult with his attorney during the entire interview, clearly a much more meaningful source of support in this context.

The district court's decision in *United States v. Goodridge* 945 F.Supp. 359, 367 (D.Mass 1996) is even more different. In *Goodridge,* while being questioned by the police in his home, the defendant limited his answers, mentioned he might need a lawyer, and indicated that he had nothing more to say. *Id.* at 367. Here, in stark contrast, the agents honored MELO's request for an attorney, put the attorney on the phone, and discontinued their questioning when the attorney needed to take a break. With MELO's attorney on the phone, it simply cannot be said that MELO's residence was an "intrusive and intimidating environment created when agents of the law take control of a person's private residence." *See United States v. Griffin*, 922 F.2d 143, 1355 n. 15 (8th Cir. 1990).

Finally, while the test to determine custodial interrogation is an objective one, the Supreme Court has also recognized practical differences, for example, between what a "reasonable child" would perceive as custody as compared to a "reasonable adult." *See J.D.B. v.*

*North Carolina*, 564 U.S. 261, 271–72 (2011) ("a reasonable child subjected to police questioning will sometimes feel pressured to submit when a reasonable adult would feel free to go").  In this case, there is a significant difference between an ordinary citizen and a trained law enforcement officer.  *See United States v. Fox*, 2009 WL 935717, at *12 (E.D. Tenn. Apr. 3, 2009), aff'd, 363 F. App'x 375 (6th Cir. 2010) ("There was no coercive or threatening atmosphere, and it is again noted that defendant was a law enforcement officer, well-schooled in any police matters that implicate the Fourth and Fifth Amendments to the Constitution").  Thus, under the circumstances of this case, a reasonable law enforcement officer in this situation would not perceive a restraint of freedom of movement or action akin to a formal arrest.  The fact that the agents did not advise a trained law enforcement officer of his *Miranda* rights inside his own home should not lead to the suppression of his admissions of guilt.  The statements were voluntary and are admissible.

## CONCLUSION

For the foregoing reasons, while the government concedes an evidentiary hearing is appropriate, the court should deny the motion because the defendant's statements were not the product of custodial interrogation under *Miranda*.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By: /s/ Neil Gallagher
Neil Gallagher
Assistant U.S. Attorney

Dated Submitted:  April 5, 2018

**Certificate of Service**

      I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.

                                     By: /s/ *Neil Gallagher*
                                            Neil Gallagher
                                            Assistant U.S. Attorney