## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 17-cr-10329-DJC** |
| | ) | |
| **JAMIE L. MELO,** | ) | |
| | ) | |
| **Defendant** | ) | |

### UNITED STATES' PRE-TRIAL MEMORANDUM

The United States respectfully submits the following pre-trial memorandum of law and fact for the trial beginning June 11, 2018.

#### The Charges in the Indictment

The indictment in this case, returned on October 25, 2017, charges MELO with three offenses.  Count One - conspiracy to commit bulking cash smuggling and structuring, in violation of 18 U.S.C. § 371.  Count Two - bulking cash smuggling in violation of 31 U.S.C. § 5332(a).  Count Three - structuring the exportation of monetary instruments, in violation of 31 U.S.C. § 5324(c)(3). The indictment further alleges that MELO aided and abetted counts two and three.

**A.      Currency and Monetary Instrument Reporting Requirements**

Section 5316 of the Title 31 of United States Code requires individuals transporting monetary instruments of more than $10,000 at one time from the United States to a place outside the United States to file a Currency and Monetary Instrument Report ("CMIR").  31 U.S.C. § 5316. The report, known as a FINCEN-Form 105 (Report of International Transportation of Currency and Monetary Instruments) requires travelers carrying currency over $10,000, either individually or

1

together in the aggregate, to file form at the time of departure from the United States with the

Customs at the point of departure. *see* 31 C.F.R. § 1010.340 (Reports of transportation of currency

or monetary transactions);[1] *compare United States v. Beltran*, 136 F. App'x 59, 60 (9th Cir. 2005)

(insufficient evidence of violation of 5316 where "[t]here is no evidence [defendant] knew he

was required to aggregate the funds at the time he was asked for his binding declaration at the

border).

    1.  Bulk Cash Smuggling

Bulk cash smuggling became a criminal offense in 2001 because the act of smuggling cash

across international borders is a form of money laundering.  *See* USA PATRIOT ACT, Pub. L.

No. 107-56, Tit. III, § 371, 115 Stat. 272 (2001).  "A common sense reality of everyday life is that

legitimate businesses do not transport large quantities of cash rubber-banded into bundles and

stuffed into packages in a backpack." *United States v. $242,484*, 389 F.3d 1149, 1161 (11th Cir.

2004).   In this case, as alleged in the indictment, MELO's co-conspirator, Carlos A. Rafael

("Person A"), a convicted defendant in criminal case 16-cr-10124-WGY, was generating large

amounts of cash from his fishing business in New Bedford, and depositing the money in accounts

in Portugal to avoid U.S. taxation.

Under 31 U.S.C. § 5332(a), it is a felony for anyone to knowingly conceal more than

---

[1]That section provides in relevant part that "Each person who physically transports . . . or causes to be . . . transported . . . or attempts to physically transport . . . or attempts to cause to be physically transported . . . currency or other monetary instruments in an aggregate amount exceeding $10,000 at one time from the United States to any place outside the United States. . . shall make a report thereof." 31 C.F.R. § 1010.340(a) (Effective March 1, 2011).   The report, known as a FinCEN Form 105 (Report of International Transportation of Currency and Monetary Instruments) requires travelers carrying currency over $10,000 to file the form at the time of departure from the United States.

$10,000 in currency (either on their person or in any conveyance, article of luggage, merchandise, or other container) and transport (or attempt to transport) such currency from the United States to place outside the United States with the intent to evade the CMIR reporting requirements of 31 U.S.C. § 5316 described above.   As applicable in this case, there are four elements: (1) the defendant concealed more than $10,000 in currency, either on his person or in any conveyance, article of luggage, merchandise, or other container; (2) the defendant transported or attempted to transport the currency outside the United States; (3) the defendant knew that he was required to file a currency report; and (4) the defendant intended to evade filing such a report.  *See* Ninth Circuit Model Jury Instruction 9.45.

Significantly, Section 5332 does not require that the defendant have the intent to evade the reporting requirement at the time the actual concealment of currency occurs. *United States v. Tatoyan*, 474 F.3d 1174, 1180 (9th Cir. 2007). Instead, the defendant can form the intent to evade reporting requirements at any time prior to or during the moment of the transport. *Id.* "Concealment is simply one part of a continuous course of conduct, at any stage of which the requisite intent can be formed." *Id.*

2.   International Structuring

As applicable here, it is unlawful for anyone to "structure or assist in structuring . . .any exportation of monetary instruments." 31 U.S.C. § 5324(c)(3).   To prove this offense, the government must prove that (1) the defendant structured or assisted in structuring the exportation of a monetary instrument; and (2) the defendant did so with the purpose of evading the more than $10,000 reporting requirement.  *See* First Circuit Pattern Jury Instruction No. 4.31.5322 (updated 10/5/2012).  Structuring occurs when an individual alters his transaction in such a way in order to

avoid the reporting requirement. *United States v. Davenport,* 929 F.2d 1169 (7th Cir.1991).

Furthermore, "[w]hile breaking up a single cash transaction that exceeds the $10,000 reporting

threshold into two or more separate transactions is one way of committing the offense of structuring

a transaction, it is not the only way." *United States v. Sweeney*, 611 F.3d 459, 471 (8th Cir. 2010).

"Both [bulk cash smuggling and structuring] are specific intent crimes and are committed

only where Defendants knew of the reporting requirements and knew that they were transporting

more than $10,000 in cash." *United States v. Del Toro-Barboza*, 673 F.3d 1136, 1144 (9th Cir.

2012).   The Government may prove specific intent through circumstantial evidence.   *See e.g.,*

*United States v. Del Toro-Barboza*, 673 F.3d 1136, 1145 (9th Cir. 2012) ("The facts here are

circumstantial, but a case such as this rarely has direct evidence").

## FACTUAL SUMMARY

A.      **Background of Investigation – the Undercover Investigation**

The investigation into MELO began with an IRS undercover investigation into Carlos

Rafael, a commercial fisherman in New Bedford known as "the Cod-father."   In about June 2015,

two IRS Special Agents, "Bob" and "Lenny"[2] approached Rafael and, posing as potential buyers of

his fishing business, asked Rafael about his business. The investigation revealed, among other

things, that Rafael's business was generating large amount of cash that Rafael managed separately

on a "cash" ledger to avoid federal income tax.   As part of Rafael's tax avoidance scheme, Rafael

---

[2]At trial, the government will offer the testimony of IRS Special Agent Robert Elias as the undercover agent.  Special Agent Elias also testified at trial against Antonio Frietas, a co-defendant of Carlos Rafael in case number 16-cr-10124-WGY.  Like Melo, Frietas was also a member of the Bristol County Sheriff's Office.  A jury convicted Frietas at trial in July 2017.  In October 2017, U.S. District Court Judge William G. Young sentenced Frietas to a term of incarceration for one year and one day.

was also smuggling large amounts of cash to the Azores (an autonomous region of Portugal) and depositing those funds into a foreign bank account.

As part of the undercover operation, the UC agents in turn asked for Rafael's help in smuggling cash to Portugal and opening up bank accounts to conceal their money. During these recorded conversations, Rafael revealed that a member of the Bristol County Sheriff's Office ("BCSO") who also worked in immigration, assisted him in smuggling money to the Azores, who he identified as Antonio "Tony" Freitas. Rafael also identified a second member of the BSCO who he described as the "captain" and his "buddy," who is defendant JAMIE MELO. Around the same time, MELO was in fact captain with the BCSO, carried the title of Administrative Captain, Public Safety Exchange Programs and served as the personal driver for BSCO Sheriff, Thomas M. Hodgson.

At the trial, the Government will not seek to introduce the entirety of the recordings and transcripts from UC operation. Instead, the Government will seek to introduce only certain relevant excerpts, that are summarized below.

*October 14, 2015 Meeting*

For example, during a meeting on October 14, 2015, at a restaurant in Mattapoisett, Massachusetts, Rafael told the agents he was traveling with his wife to the Azores on November 10, 2015 (pg. 2:32). During this same meeting, Rafael also told the agents that he always took cash with him on the flight to the Azores (*"I always take a lot, my own, I take 11 40, 50, 60,000 every time I travel . . ."*) and said he had help from someone who worked in the Bristol County Sheriff's Office who also worked in immigration. Specifically, Rafael told the agents:

> But I guess in Boston, I can get the money through. I have one of the guys
> in Boston, one of those fuckin' agents who is my friend, and I give him

the money before I go through security . . . Then I go to the bathroom . . . He gives me the motherfucking money . . . Even if he is not in the airport, he lives in Rhode Island, I'll call him up. I don't give him nothing. He is my friend . . . I call him. I says, Hey, I'm flying  out tonight. "You're not fucking, I'm not working tonight." No, you better get your fucking ass here because I got like 60,000 in my fucking ass. I ain't going through the fucking thing. So he goes there, I give him the envelopes, he puts them in his pockets. He doesn't go through security because he has got one of those fuckin' badges. He's an agent over there. (pg. 2:36)

Seconds later, if he sold them his business, Rafael offered to smuggle money for the agents.  Rafael said he would be their "carrier."  Rafael said, *"If we make this deal, later, if you want to pass sh\*t over to the other side . . . I'll be your carrier, I'll be doing a lot of traveling."*  (Pg. 2:37).  Rafael further instructed the agents that, to avoid detection, they needed to take small portions of money at a time – to be a pig, but not a hog, because "hogs get slaughtered" and cautioned to move the money *"[v]ery slowly, like I told you 60, 80, 70, no more than that."* (pg. 2:38-39).

Minutes later, after telling the agents that his friend from Sheriff's Department was Portuguese and from the island of San Miguel in the Azores, Rafael told the agents that he also had a second friend at the Sheriff's Office who was also from San Miguel who Rafael described as his buddy, the captain. (*"My buddy, the captain is Portuguese, from Saint Miguel also."*) (the defendant, Capitan JAIME MELO) (pg 2:46).

Later in the conversation, Rafael went further and identified his two friends at the Sheriff's Office by name as "Jimmy Freitas" and "Jimmy Melo" (*"No, no, the other one is not Jimmy Frietas, the other one is Jimmy Mello."*) (pg. 3:6). Moments before, Rafael told the agents that he had traveled to the Azores with "Jimmy" three of four times. (*"I flew with the prick already two or*

*three times, he is good friends with the Sheriff. He's good friends with Jimmy the guy who is the captain who goes and does the cooking over there, so he knows me very well"*). (pg. 3:3).

*Before the Flight - October 24, 2015 and November 6, 2015 Recorded Phone Calls*

During recorded phone calls on October 24, 2015 and November 6, 2015, Rafael warned the UC agents that he could not carry money for them on his upcoming flight on November 10, 2015.  Rafael said he had to carry about $30,000 for himself.  Rafael also said that he was concerned because he was going to be traveling with several law enforcement officers for a charity event in the Azores, a Thanksgiving dinner the BSCO sponsored in the Azores.

For example, in a recorded call on October 24, 2015, Rafael told the agents that he could not carry money for them *"because I have to take some myself."*  Rafael said he was already taking "50" and could not *"take another 50."*  During a call on November 6, 2015, Rafael told the UC agents that again could not transport money for the agents because he was carrying $30,000 for himself and there were *"too many people with badges around."*

**B.      The November 10, 2015 Flight from Boston to Portugal**

On November 10, 2015, agents set up surveillance at Boston Logan and watched as Rafael, MELO, and others boarded the Sata International flight number 220 from Boston (BOS) Logan to Ponta Delgada Joao Paulo II (PDL) in San Miguel, Azores.  Based on the testimony of other participants on the flight to the Azores, surveillance images, travel and phone records, the evidence will demonstrate:

On November 10, 2015, MELO had a BSCO van and box truck transport approximately 60 boxes of frozen turkeys and other donated goods to Boston Logan for a charity event in the Azores.

The charity event was a Thanksgiving dinner for deportees that the BCSO sponsored and Rafael was one of its financial supporters.[3]  The BSCO van and truck also drove several passengers on the same flight, including Rafael and other friends and associates of MELO.  Some of the passengers, including Rafael, MELO, and Joseph and Maria Reposo, were participating in the BCSO sponsored charity event.  Others, like Arnaldo Oliveira and Tony Soares, were simply visiting family.

On the way to the airport, while at a rest stop on Route 24, Soares told the driver of box truck, Deputy Sheriff Jamie Salgado, that MELO had just asked him if he (Soares) could carrying an envelope carrying $10,000 on the flight to the Azores.  Salgado told Soares not to do it, and Soares said he would not, but Salgado never confronted MELO about the allegation.[4]

The van and box truck arrived at Terminal E at Boston Logan at around 8:45 p.m. and about 60 boxes of frozen turkeys were offloaded into the terminal.  Before going through the TSA security checkpoint, MELO separately approached and asked three of his travel companions, Joseph Raposo, Arnaldo Oliveira, and Tony Soares if they could carry an envelope carrying cash on the flight to the Azores for Rafael.  MELO directed the three into the public bathroom and handed them the envelopes.[5]  MELO told some of them not to worry because the envelope contained less than $10,000.  One of the witnesses, Joseph Raposo, got two envelopes and stuffed one of them in his wife's handbag.

---

[3]For example, one of MELO's BCSO emails on November 3, 2015 included a document entitled "Thanksgiving Donations 2015" that included the name "Carlos Rafael" near the top of the list.

[4]The government will be seeking to introduce this hearsay statement as a present sense impression under Fed. R. Evid. 803(1).  In addition, to the extent that Soares denies making such a statement, the government will seek to impeach Soares with his prior inconsistent statement.

[5]One witness, Tony Soares, stated that he received the envelope of money from MELO before entering the bathroom.

While going through the security checkpoint, TSA discovered that Rafael had approximately $27,000 in cash in his briefcase.   Upon making the discovery, Customs and Border Protection Inspectors ("CBP") inspectors escorted Rafael to a secondary location, counted the money, and had Rafael complete a FinCEN Form 105. The incident caused SATA flight number 220 to be delayed for about an hour as the plane waited for Rafael. During this time, MELO assured one of the individuals to whom he gave an envelope that everything was going to be okay and said he was calling someone from the Sheriff's Office to make sure.

Around the same time, between approximately 9:10 a.m. and 10:17 p.m., MELO had four phone calls with Antonio Frietas.  Frietas was also a member of the BCSO, an indicted co-conspirator of Rafael in criminal case 16-cr-10124-WGY.  In July 2017, a jury convicted Frietas of smuggling and structuring cash on a flight from Boston to the Azores on February 6, 2016.  During this time, Frietas was the only member of the BCSO that MELO was calling when he said he was talking to someone from the Sheriff's office.   On August 20, 2017, during an interview with federal agents, MELO falsely denied having any contact with Frietas that day.  MELO told the agents he had no reason to talk to Frietas that day.

Once they arrived at the airport in the Azores on the morning of Wednesday, November 11, 2015, MELO retrieved the envelopes of cash from them and gave the money to Rafael.  Two days later, on Friday, November 12, 2015, based on records from Banif Bank in Portugal, Rafael deposited $76,000 in cash into his account at Banif Bank in Portugal under his full name, Carlos Alberto Noia Rafael.  Minus the approximately $27,000 Rafael had in his possession, Rafael thus deposited another $49,000 in cash.  Divided by 5 people, each amount was $9,800, less than $10,000.

After Rafael returned from the Azores, Rafael told the UC agents in a recorded call that it was *"a good thing we didn't try sh\*t"* (smuggle money) because *"[t]hey grabbed me, they took me down the stairs,*[and told me] *you have to declare"* (the money).  Rafael also told the agents that fortunately, he had passed some of his money to other people on the flight: *"Good thing I passed it to a lot of people that were there with me; if not, would have been a freaking nightmare, and I still had – and I still had extras I had to declare."*

C.     **The Investigation and MELO's Statements to Witnesses During the Investigation**

In February 2016, federal agents arrested Rafael on a criminal complaint.  The complaint was based allegations that Rafael and one co-defendant obstructed the operations of the National Oceanic and Atmospheric Administration ("NOAA") by submitting false reports.  Thereafter, beginning in April 2016, federal agents began interviewing a number of witnesses who participated in the November 10, 2015 flight to the Azores.  Initially each of these passenger witnesses – Joseph Raposo, Maria Raposo, Arnaldo Oliviera and Antonio "Tony" Soares (identified as Person's B-E in the indictment) lied to federal investigators and denied any involvement or knowledge of bulk cash smuggling.  Each of these witnesses also told MELO about their initial conversations with law enforcement and told MELO that they had lied to the agents. MELO asked about their conversations with federal agents and eventually their appearance before a grand jury.

On May 9, 2016, federal investigators arrested Freitas and unsealed the indictment charging Frietas with bulk cashing smuggling and structuring with Rafael.  After this, while MELO never told any witness to provide false information, MELO applied subtle pressure, told them how he had messed up, and said how he was worried about losing his job.  To several

witnesses, MELO admitted to handing out envelopes to the witnesses on the flight, but insisted that the money belong to Rafael and that he never looked inside envelopes.

After being served with grand jury subpoenas, each of the witnesses described above admitted that they had initially lied and admitted that MELO had asked them to transport envelopes cash to the Azores for Rafael.

Finally, as the court is aware, on August 30, 2017, the defendant made a series of incriminating statements to federal agents that are currently the subject of a motion to suppress.

**Conclusion**

Accordingly, the government respectfully submits the above pre-trial memorandum.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By: /s/ *Neil Gallagher*
Neil Gallagher
Assistant U.S. Attorney

Dated Submitted:  May 24, 2018

**Certificate of Service**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.

By: /s/ *Neil Gallagher*
Neil Gallagher
Assistant U.S. Attorney